IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| LOJOLUKE FALADE, <br> Plaintiff, | * <br> * <br> * <br> * <br> * | |
| v. | * <br> * | Civil Action No. 8:10-cv-02047-AW |
| BEVERAGE CAPITAL CORPORATION, <br> Defendant. | * <br> * <br> * <br> * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Memorandum Opinion**

Plaintiff Lojoluke Falade brings this action on behalf of her minor children Ebunoluwa
Falade and Andrew Falade against Defendant Beverage Capital Corporation. Plaintiff asserts
claims for negligence and breach of warranty. Presently pending before the Court is Defendant's
Motion for Summary Judgment. The Court has reviewed the entire record and finds no hearing
necessary. For the reasons that follow, the Court **DENIES** Defendant's Motion for Summary
Judgment.

I.      **FACTUAL & PROCEDURAL BACKGROUND**

This case presents a straightforward action for negligence and breach of warranty with
largely undisputed facts. Defendant Beverage Capital Corporation ("BCC") is a Pennsylvania
corporation and a wholly owned subsidiary of Canada Dry Potomac. Doc. 24. Dr. Pepper Seven
Up Inc. ("DPSU") contracted with BCC to bottle the soft drink "7UP" in Landover, Maryland.
Doc. 12 at 2. BCC has admitted to bottling the 7UP that has become the basis of this action.
Doc. 37-7 at 6.

1

Plaintiff Lojoluke Falade is the mother of Ebunoluwa Falade ("Angela") and Andrew Falade ("Andrew").  On Wednesday December 8, 2009, the Falade family sat down for dinner. As part of their meal, Andrew and Angela both intended on consuming a glass of the soft drink 7UP.  Both children took a sip of the presumed 7UP at approximately the same time and proceeded to drink only small amounts of it before spitting the remainder of it out.  *See* Doc. 37-4 at 9, 11; Doc. 37-3 at 5.  Andrew testified that the 7UP had an "unusual taste," "tasted like water," and that it "had no sugar, nothing inside."  Doc. 37-3 at 4, 7.  He also stated that "it wasn't . . . bubbly," and that it had no smell.  *Id.* at 6–7.  Angela testified in her deposition that "[i]t tasted like water with like chemicals in it" and that "it looked like water."  Doc. 37-4 at 9–10.  She proceeded to wash the glass and then tasted the soda again, only to discover that the presumed 7UP still tasted differently.  *Id.* at 12.  The children did not consume any more of the presumed 7UP that evening and drank water instead.  *See* 37-3 at 7.

The following day—Thursday, December 9, 2009—Andrew woke up feeling nauseous and began vomiting at approximately 6:00 a.m.  *Id.* at 9.  As a result, Andrew stayed home from school and vomited two additional times, once in the afternoon and once in the evening.  *See id.* at 8–9.  Angela did attend school the following morning; however, she visited the school nurse and complained of stomach aches and a headache.  Angela spent approximately an hour in the nurse's office, where she eventually vomited.  Doc. 37-4 at 5, 7.  Afterwards, she returned to her classes for the remainder of the day, but continued to experience stomach pains through Friday December 10, 2009.  *Id.* at 7.  During that time period, she vomited and experienced two to three episodes of diarrhea.  *Id.* at 7-8.

Subsequently, their parents took them to the emergency room at the National Children's Health Center.  There, they were diagnosed with gastritis, an inflammation or swelling of the

2

stomach.  *See* Doc. 37-5 at 7.  The children were not prescribed any medicine, but rather given

home care instructions including constant fluid intake, Tylenol, and suggested foods for

consumption.  *See id.*  The emergency room doctor made no conclusions as to the cause of the

gastritis.  *See id.*  The symptoms subsided by the end of the week but, for precautionary reasons,

the children consulted with their primary care physician during a scheduled physical in January.

*See* Doc. 37-6 at 5.  There is no admissible evidence on the record indicating whether the doctor

made any conclusions regarding the cause of the children's gastritis.[1]

It is undisputed that Plaintiff purchased the presumed 7UP[2] bottled by BCC at Shoppers

Food, Inc. Doc.  37-7 at 6.  After the children became ill, BCC conducted testing on the

remaining 7UP.  A BCC representative, Doyle Dufek, concluded that the liquid inside the 7UP

bottle was "plain old water."  Doc. No. 37-8 at 2.  Dufek attempts to explain this apparent

anomaly:  "The maint group used some 2ltr green bottles to complete the change over from 20oz

to 2ltr.  These bottles were not removed from the line when we started producing 7UP at approx

7am.  The 'water' bottles were labeled as 7up [sic]." *Id.*  Another BCC representative, Tamira

Haroian, reviewed the results and concluded that the liquid's pH level was 6.42.  Doc. 37-9 at 5.

From this, she inferred that it was "probably water" and "would result in no ill effects."  *Id.* at 6.

This question of causation is the main fact in dispute.  Whereas Plaintiff contends that the

children's illness directly results from their imbibition of the liquid contained in the 7UP bottle,

---

[1] Plaintiff has attached a letter from the children's primary care physician stating that the children were
seen at the hospital for a condition caused by consumption of the presumed 7UP.  Doc. 39-4 at 1.
However, this letter is inadmissible hearsay and, therefore, will not be considered by the Court in ruling
on the instant motion.  "Hearsay statements . . . cannot support or defeat a motion for summary
judgment." *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962,
967 (4th Cir. 1995).  Additionally, Plaintiff has not provided any affidavits, deposition testimony, or other
admissible evidence to support the doctor's purported medical conclusion.
[2] The Court will refer to the presumed 7UP as "7UP" for simplicity's sake.

Defendant argues that the 7UP could not have caused their illness because they contained only water.

Plaintiff originally filed her complaint in the Circuit Court for Prince Georges County against DPSU and Supervalu, Inc.  The case was removed from state court on July 27, 2010. Doc. 1.  On August 24, 2010, DPSU impleaded BCC on theories of contribution and indemnification.  Doc. 12.   Through stipulation by the parties, both DPSU and Supervalu were dropped as defendants.  Doc. 18.  The parties subsequently underwent discovery and now BCC moves for summary judgment on two primary grounds: (1) that Plaintiff cannot prove causation; and (2) that Plaintiff cannot prove the existence of any warranty.

## II.     STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *See*

*Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998).  Additionally, hearsay

statements or conclusory statements with no evidentiary basis cannot support or defeat a motion

for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of*

*Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.     LEGAL ANALYSIS

### A.      *Negligence*

To establish a negligence claim, a plaintiff must show "a duty owed to him (or to a class

of which he is a part), a breach of that duty, a legally cognizable causal relationship between the

breach of duty and the harm suffered, and damages."  *Jacques v. First Nat'l Bank,* 515 A.2d 756,

758 (Md. 1986).  Ultimately, BCC challenges only the element of causation.  *See* Doc. 32 at 4.

"It is a basic principle that '[n]egligence is not actionable unless it is a proximate cause of

the harm alleged.'"  *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009) (quoting *Stone v.*

*Chicago Title Ins.,* 624 A.2d 496, 500 (Md. 1993)).  Under Maryland law, proximate cause has

two separate requirements.  It must be both a "cause in fact" and "a legally cognizable cause."

*Id.* (quoting *Hartford Ins. Co. v. Manor Inn*, 642 A.2d 219, 230 (Md. 1994)). To prove

causation-in-fact, a party must show that the event "would not have occurred absent or 'but for'

the defendant's negligent act."  *Id.* at 786–87 (citations omitted).

Once but-for causation is established, the next inquiry is whether the but-for cause was

the legally cognizable cause.  To determine whether the but-for cause is the legally cognizable

cause, courts ask "whether the actual harm to a litigant falls within a general field of danger that

the actor *should* have anticipated or expected."  *Id.* at 787 (citing *Stone,* 624 A.2d at 500).

Generally, proximate cause is a question for the jury.  *See id.* at 792 (citing *Caroline v. Reicher,*

304 A.2d 831, 835 (Md. 1973)) ("Unless the facts admit of but one inference . . . the determination of proximate cause . . . is for the jury.').

BCC argues that Plaintiff cannot establish a causal link between consumption of the 7UP and the children's illness because, in its estimation, medical testimony is necessary to make this connection and Plaintiff has adduced no such evidence.  Under Maryland law, medical testimony is *sometimes* necessary to establish causation.  "[R]eliance on lay testimony alone is not justified when the medical question involved is a complicated one, involving fact-finding which properly falls within the province, of medical experts."  *See Wilhelm v. State Traffic Safety Comm'n*, 185 A.2d 715, 719 (Md. 1962).  However, there are situations in which medical testimony is unnecessary to establish causation.  *See id.* The *Wilhelm* court noted three such situations: (1) "when the disability develops coincidentally with, or within a reasonable time after, the negligent act"; (2) "where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it"; and (3) "where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen."  *Id.* (citations omitted).

Howbeit close the call, this case falls into the latter situation; i.e. where expert testimony is not per se necessary to establish a causal relationship.  Construing the evidence favorably for Plaintiff, there is a genuine dispute concerning the contents of the soda bottle.  BCC has adduced evidence purporting to show that it contained only water.  Inconsistently, however, Angela testified that it tasted like water with chemicals in it.  Moreover, the children's illness "developed coincidentally with, or within a reasonable time after" the alleged negligent act occurred.  Both Andrew and Angela fell ill within 24 hours of consuming the soda.  Additionally, the children testified that they adhered to their daily routine on the day in which they imbibed the beverage.  Viewing the evidence in the most favorable light, however unlikely this outcome, a reasonable

jury could conclude that the bottle contained a substance other than 7UP or water, and that this

substance proximately caused the injuries of which the children complain. Common experience

and knowledge teaches that the ingestion of food or liquid which is potentially unsuitable for

consumption can result in the rather commonplace symptoms experienced by the children (i.e.

vomiting and diarrhea). Accordingly, the Court denies BCC's Motion for Summary Judgment in

relation to its argument that no reasonable juror could conclude that the unidentified substance

caused the children's injuries.[3]

**B.      Breach of Warranty**

To establish a breach of warranty claim, plaintiffs must show "the existence of the

warranty, the fact that the warranty was broken and that the breach of warranty was the

proximate cause of the loss sustained." *Sheeskin v. Giant Food, Inc.*, 318 A.2d 874, 880 (Md.

Ct. Spec. App. 1974) (citations omitted). An implied warranty of merchantability exists "in a

contract for their sale if the seller is a merchant with respect to goods of that kind." Md. Code

Ann., Com. Law § 2-314(1). A seller "includes the manufacturer, distributor, dealer, wholesaler

or other middleman or the retailer . . . ." *Id.* § 2-314(1)(a).

Defendant argues that Plaintiff has not proven the existence of any warranties. However,

Plaintiff pleaded breach of the implied warranty of merchantability in her complaint. Compl. ¶

25, Doc. No. 2. Moreover, implied warranties are just that—implied. The warranty exists

"unless excluded or modified" if the entity is a seller of the allegedly defective goods. To

establish its existence, Plaintiff need show only that BCC is a seller of goods subject to the

implied warranty. Since BCC is responsible for the bottling of the products, its status as a

---

[3] Although Plaintiff has provided enough evidence to withstand summary judgment, the Court will likely have to decide at a later point whether Plaintiff can survive a motion for judgment as a matter of law on the issue of causation.

"middleman" has clearly been established through discovery.  *See* Doc. 37-7 at 6.  Additionally,

§ 2-314 of the Commercial Law Article makes clear that the warranty is applicable to sales of

food and beverage for consumption both on and off site.  *See* Md. Code Ann., Com. Law § 2-314

(1).  Therefore, based on the record evidence, there is no serious dispute about whether an

implied warranty exists.

In terms of breach, the implied warranty of merchantability warrants that goods are "fit

for the ordinary purposes for which such goods are used" and that they "[c]onform to the

promises or affirmations of fact made on the container or label if any."  *Id.* § 2-314 (2)(c), (f).

BCC concedes that the container did not contain true 7UP.  Furthermore, there is testimony that

the beverage tasted like chemicals.  Clearly, then,  a genuine dispute exists regarding whether the

goods were fit for their ordinary purpose of consumption and conformed to the promises made

on the bottle label.  Moreover, for reasons articulated in Part III.A, *supra*, genuine disputes of

material fact permeate the issue of causation.  For these reasons, Defendant's Motion for

Summary Judgment on Plaintiff's breach of warranty claim is denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary

Judgment. A separate Order will follow. Also, the Court will schedule the case for a three-day

jury trial.

<table>
<tr><td>   April 20, 2012   </td><td>   /s/   </td></tr>
<tr><td>Date</td><td>Alexander Williams, Jr.<br>United States District Judge</td></tr>
</table>